STATE OF MISSOURI upon the Information of ROY MCKITTRICK, Attorney General, Relator, v. STANLEY WALLACH, Prosecuting Attorney of St. Louis County, Missouri.—No. 38400.—182 S. W. (2d) 313.

Court en Banc, September 5, 1944.

*Roy McKittrick*, Attorney General, *John S. Phillips* and *Vane C. Thurlo*, Assistant Attorneys General, for relator.

314

*Jacob M. Lashly, Harvey B. Cox* and *Walter Wehrle* for respondent.

HYDE, J.—This case, recently coming to the writer by reassignment, is an original proceeding in quo warranto to declare forfeiture of the office of prosecuting attorney of St. Louis County, and to oust respondent therefrom. We appointed Honorable Roscoe P. Conkling of St. Joseph as Special Commissioner to hear the evi-

dence and to report findings of facts and conclusions of law thereon. He found for the respondent and recommended dismissal of the information. Relator has filed exceptions.

Respondent was elected to the office of prosecuting attorney in 1938, 1940 and 1942. The Commissioner's report summarizes relator's charges (which were limited to the years 1941 and 1942, respondent's second term) placing them in four general classifications, as follows:

"(1) That respondent willfully, knowingly, continuously, corruptly and unlawfully neglected, failed and refused to investigate, commence prosecutions of and prosecute various persons (95 persons named in the Information) for violations of the Liquor Control Act and Non-Intoxicating Beer Laws of Missouri;

"(2) That without any reason, cause or justification therefor the respondent dismissed and caused to be dismissed various criminal cases (none designated by name or number in the Information) pending against persons charged in said county with felonies and misdemeanors;

"(3) That although respondent was advised of the evidence thereof, he has failed and refused to commence and prosecute criminal actions against persons (none designated by name in the Information) who set up, kept and operated certain named gambling machines and devices;

"(4) That respondent has failed and refused to commence and prosecute criminal actions against persons (none designated by name in the Information) who established, openly advertised and conducted lotteries:"

 Concerning lotteries, the Commissioner found "that the charge made by relator in the Information that respondent has failed and refused to commence and prosecute criminal actions against persons who established, advertised and conducted lotteries in St. Louis County is unsupported by any proof whatever." His findings as to gambling devices were as follows: "That a relentless crusade against slot machines and gambling devices was carried on by the sheriff of the county; that when a slot machine was found it was always seized and eventually destroyed; that respondent prosecuted in every case in which a slot machine or other gambling machine was found, and prosecuted every such case wherein he was requested to institute prosecution and in which he was advised of any evidence; . . . that the respondent conducted a campaign against the operation of 'bookie' shops (for betting on horse racing and baseball) in the county; . . . that the respondent has not failed and refused to commence and prosecute criminal actions against persons who set up, kept and operated certain gambling devices named in the Information." Relator has not excepted to these findings as to the lottery

charges and has not briefed the exception as to gambling charges. We, therefore, consider them to be abandoned.

██ Relator's claims of misconduct in failing to prosecute, now relied upon, concern the alleged failure to prosecute liquor cases; and the charges of improper dismissal of criminal cases so far as briefed, or reviewed by the Commissioner's report, also relate to liquor cases. Relator contends that he has shown a violation of duty by respondent sufficient to require a declaration of the forfeiture of his office because of his failure to prosecute (or to prosecute further on those in which proceedings were commenced) in 85 specific cases, set out in relator's brief. (The Commissioner found, that respondent did prosecute in 39 of the cases but some prosecutions were on offenses discovered after further investigation.) These claims are based on Sec. 4878 (R. S. 1939), Mo. R. S. Ann., which requires the Supervisor of Liquor Control to send to the prosecuting attorney of each county, at least once each month, "a list of all complaints made to or by him against licensees (within such county) for alleged violations of the liquor control act"; and Sec. 4876 (R. S. 1939) Mo. R. S. Ann., which requires that prosecuting attorneys "shall investigate and prosecute all violations" of the liquor control act. It is relator's position that respondent has not faithfully performed this duty with respect to violations of which he had notice from the supervisor.

Relator says: "respondent was familiar with the facts of the different violations, which were introduced by the State, and that, with few exceptions, he failed to prosecute the violators. . . . The record contains instances of persons being acquitted by justice of the peace juries because the liquor purchased from them was not analyzed by chemists; instances where defendants were discharged because samples of the liquor were not saved, although shown to have been intoxicating; instances where some were discharged upon admitting their guilt and paying the costs; and other rather unusual endings. . . . On only four occasions did the respondent file any action in which he asked that the person violating the aforesaid laws be enjoined from further operating his establishment."

Relator further says: "The Circuit Court of St. Louis County had jurisdiction in misdemeanor prosecutions, and it was respondent's duty to file misdemeanor cases there when he knew or could have known that such prosecutions were unsatisfactory and futile in justice courts, as disclosed by the evidence here. Relator contends that respondent knew by actual experience that liquor and non-intoxicating beer misdemeanor cases could not be properly ██ prosecuted in certain justice courts in his county, and that he abused his discretion in continuing to file them there."

Concerning these charges the Commissioner made extensive findings of fact which may be thus summarized: St. Louis County has a

population of about 350,000 and contains 483 square miles, of which 51 square miles are in incorporated areas and the remainder unincorporated. In some instances an area of congested population in an unincorporated district adjoins an area of congested population in an incorporated district, so that on one side of the street the district is unincorporated and on the other side incorporated. Sec. 4890 (R. S. 1939) Mo. R. S. Ann., prohibits sale by drink of alcoholic beverages in excess of 5%, outside the limits of certain cities. This required liquor laws to be administered and enforced in one way on one side of the street and in another way on the other side. These conditions made the liquor control problem more confusing and difficult than anywhere in the state. Grand Juries several times pointed out the need for changes in the Liquor Control Act to meet this situation. In 1941 there were about 1300 licensed drink places in the county but by 1943 this number has been reduced to 875. The State Liquor Control Department, prior to July 1941, followed the practice of having inspections made on week ends by inspectors regularly assigned to work in other parts of the state and unknown to licensees in St. Louis County. Very little effort was made by these state inspectors to identify the person guilty of violating the law, but they sought mainly to determine whether violations were being permitted on the premises of licensee. When such inspection disclosed a violation, the licensee was cited before the Supervisor of Liquor Control in Jefferson City to show cause why his license should not be revoked. In many such instances, the Supervisor did not revoke the license but suspended it so as to retain jurisdiction to regulate the licensee. Transcripts of these cases were sent to respondent, the practice of forwarding transcripts having been begun by Supervisor Pierce before the statute requiring it was enacted.

In July 1941, Sheriff Willman, Supervisor Henderson and respondent, discussed the St. Louis County situation and agreed upon a cooperative method of handling the liquor control problem. Respondent pointed out to the supervisor that the transcripts received from him did not contain sufficient evidence of identification of the person guilty of violating the liquor control laws. It was agreed that when a state inspector discovered a violation he would immediately call a deputy sheriff by phone, who would come and arrest the person identified by the inspector. The deputy sheriff would then swear to the complaint and testify in the case and thus avoid the necessity of sending state inspectors back to St. Louis County to attempt identifications. This cooperative method of handling liquor problems greatly improved liquor control conditions. Better cooperation among tavern owners, to prevent law violations, was also obtained.

Respondent considered liquor law enforcement among the most important and most difficult business of his office, and kept his best

men in charge of liquor law violation cases. Respondent's chief assistant was a former circuit judge of St. Louis County, who had also served three terms as prosecuting attorney, and he was put in charge of liquor violation cases. He studied the transcripts received from the Liquor Control Department, made briefs thereon, advised with respondent about them, and supervised the prosecution of liquor violation cases. Later it was necessary for the Judge to take charge of certain new cases of pressing importance and respondent placed, in direct charge of liquor law violation cases, the assistant who had previously worked with the Judge. Respondent had no investigating staff, and only four assistants, but he used them all for investigation purposes and also called upon deputy sheriffs, constables and police officers of the various cities and county for investigation and surveillance of premises and persons reported to have been violating the law.

The Commissioner made an analysis in his report of 68 of the specific cases, upon which relator relies, and made findings of proper handling by respondent in each of them. He made general findings of good faith as to all the others. The Commissioner made the following further findings concerning respondent's work: ''That respondent was an able and diligent prosecuting attorney, working many nights in his office, personally handling the Circuit Court docket, personally trying all capital cases and all difficult jury cases; that since January 1939 his office handled to ▇▇▇▇ disposition 27,502 misdemeanor cases (convictions 55% in 1939, 63% in 1940, 65% in 1941, 70% in 1942) and since January 1939, obtained convictions in 341 felony cases, in only 17 felony cases were there acquittals; that respondent has filed 445 prosecutions for liquor law violations of which 114 were filed in 1941 and 1942, and 81 in 1943; that on one occasion respondent received transcripts of 71 reported violations of the liquor laws (from the former Supervisor) and prosecutions were filed on all of said reported 71 violations, but the results thereof were only indifferent (many were acquitted by juries); that in 1941 and 1942 respondent's office tried 64 cases of liquor law violations, in which there were 31 convictions and 33 defendants were acquitted or discharged. . . . ''that the civil and criminal dockets for the four divisions of the Circuit Court of St. Louis County were badly congested; that each of said divisions of said Circuit Court generally devoted but one week during each of its three terms a year to the trial of criminal causes; that capital cases, cases wherein the defendants were not out on bond, and rape, murder, kidnapping, burglary and robbery cases were given preference by the courts in the setting of criminal cases for trial; that many criminal cases were continued from term to term for lack of time to try them; that trials of liquor cases could be obtained much more quickly in the Justice of the Peace courts than in the Circuit

Courts; and that to add a further number of liquor violation cases to the Circuit Court dockets would delay the trial of such liquor violation cases for three or four terms."

The Commissioner further found "that respondent has an excellent reputation as an able, conscientious, aggressive and impartial prosecuting officer; that many law enforcement and peace officers of the county, among them the Sheriff, Highway Patrolmen, the Chiefs of Police of Webster Groves, University City, Richmond Heights, Clayton, Ferguson, Kirkwood and Brentwood, the Probation Officer, and the State Supervisor of Liquor Control testified respondent and his assistants gave to them good cooperation, and that respondent's reputation as a fearless, aggressive and impartial prosecuting attorney was most excellent; that many professional men, among them lawyers, former Circuit Judges, the present Presidents of the St. Louis County and St. Louis Bar Associations, ministers of the gospel of various faiths, physicians and school superintendents testified that respondent's reputation as a moral Christian gentleman, as a courteous, conscientious, capable, fair, hard-hitting public prosecutor possessing public confidence was most excellent; that there was no testimony in the case remotely tending to establish that respondent was corrupt or lacking in integrity as a public official. . . . That in many instances (but not all instances) of claimed violations reported to respondent by transcript from the Supervisor of Liquor Control, the respondent himself made personal further investigations of the reported violation by going out himself and seeking further evidence. On his way home from his office and at nights on special trips over the county for those purposes, respondent made inquiries and visited various places of business of various licensees, talked with various persons that he might be personally advised about the claimed violations and that he might better determine what action should be taken by him. On other occasions, he caused his assistants to make similar further personal investigations and the results of their investigations were reported to respondent. On yet other occasions, respondent had the reported violations further investigated by various peace officers of the county and the results thereof were reported to him. The record herein discloses that in some forty-six instances after claimed violations were reported to respondent by transcript that respondent had the licensee and his place of business placed under the further surveillance of a deputy sheriff or other peace officer, and while in many instances the transcript originally received by respondent did not disclose facts upon which respondent was justified in instituting a prosecution, yet such further surveillance by the peace officer did disclose a further violation which respondent did thereupon proceed to successfully prosecute."

The Commissioner also found "that the transcripts of hearings before the Supervisor of Liquor Control which were received by the

respondent were each investigated and carefully studied by the respondent and his assistants with a view to determining the available proof, the applicable law, the evidence of identification and the chances of successful prosecution; . . . that after investigation and study ▮ of each transcript, if respondent concluded he could not successfully prosecute such reported violation, the Supervisor was advised why such violation was not filed on; that as to each violation reported by transcript, the respondent or one of his assistants made his own decision in each case determining the question of prosecution or no prosecution; that in determining such question in each case the respondent in good faith exercised his discretion, was motivated only by his own best judgment of the public interest and was free from any corrupt motive. . . . That the charge made by the relator in the Information that respondent without reason, cause or justification dismissed or caused to be dismissed in the courts any cases against persons charged with crimes, is unsupported by any proof in the record.''

Relator's contention is that respondent did not prosecute all violations of the liquor control laws concerning which he had information. His main argument is that respondent did not sufficiently investigate all of the violations reported in the transcripts received from the state supervisor. Relator makes general statements about the whole matter such as ''respondent was derelict on contenting himself with an examination of the transcripts sent him by the supervisor'' and ''respondent's failure and refusal to prosecute individuals who were guilty of violating the nonintoxicating and intoxicating liquor statutes was willful''. However, relator's brief does not point out the facts of specific cases to support these claims or to show that as to any of them there was insufficient evidence to support the findings made by the Commissioner concerning them. On the other hand, the Commissioner's report analyzed the facts of many specific cases, set out the names of more than forty licensees and bartenders, who were prosecuted by respondent and found in these prosecutions (and also in injunction suits against some of them) ''that in good faith he exercised the discretion vested in him by law and sought to do his duty to enforce the law and obtain convictions''. He further found ''that respondent was justified in the good faith exercise of his discretion, in declining to initiate and proceed with prosecutions'' in the cases of more than thirty others (upon whose premises violations were reported by agents of the supervisor) set out by names and dates in his report, with analysis of the evidence which the liquor enforcement agents could give therein, ''because the evidence of identification was insufficient to warrant the institution of a prosecution with any reasonable expectation of conviction''. He also stated the facts found by him in many other cases, specifically covered in his report, upon which he based his findings that in those cases ''re-

spondent, in good faith, exercised his discretion in determining the question of prosecution or no prosecution'', or in determining against further prosecution in others likewise specifically discussed.

Relator's brief discusses none of these cases on their facts. He makes certain statements which are of course true, namely: that ''respondent's duty to prosecute law violations cannot be diminished by arrangements made with other officers''; that ''respondent, as Prosecuting Attorney, was not subject to the direction or control of the Supervisor of Liquor Control''; and that ''respondent is not excused from failing to enforce the laws because of local sentiment or prejudice.'' However, it is not pointed out how the facts of any particular case violate these principles, while the Commissioner's report did analyze them and show that upon their facts they did not do so. Moreover, we must consider the situation with which respondent was confronted, as a whole, in determining his faithfulness to duty. As the Commissioner stated, the fact that relator or some one else, in a particular case, ''might have reached a different conclusion'' as to commencing or continuing prosecution falls far short of proving the allegations of the information. The Supervisor of Liquor Control has statewide jurisdiction, authority to grant, suspend and revoke licenses, and an adequate investigating force. [Chap. 32 (R. S. 1939) Mo. R. S. Ann.] While he has enforcement powers beyond those of prosecuting attorneys, it is, of course, contemplated that they shall prosecute violations, and that there shall be full cooperation between them and the Supervisor. The Commissioner found, and the evidence supports his findings that there was such cooperation in this case.

We approve and adopt the statement of the Commissioner concerning the duty of respondent, and his application of the rules stated to this case, as follows:

''The duty of a prosecuting officer necessarily requires that he investigate, i. e., inquire into the matter with care and accuracy, that in each case he examine the available evidence, the law and the facts, and the applicability of each to the other; that his duties further require that he intelligently weigh the chances of successful termination of the prosecution, having always in mind the relative importance to the county he serves of the different prosecutions which he might initiate. Such duties of necessity involve a good faith exercise of the sound discretion of the prosecuting attorney. 'Discretion' in that sense means power or right conferred by law upon the prosecuting officer of acting officially in such circumstances, and upon each separate case, according to the dictates of his own judgment and conscience uncontrolled by the judgment and conscience of any other person. Such discretion must be exercised in accordance with established principles of law, fairly, wisely, and with skill and reason. It includes the right to choose a course of action or non-action, chosen not willfully or in bad faith, but chosen with regard

to what is right under the circumstances. Discretion denotes the absence of a hard and fast rule or a mandatory procedure regardless of varying circumstances. That discretion may, in good faith (but not arbitrarily), be exercised with respect to when, how and against whom to initiate criminal proceedings (Watts v. Gerking (Ore.), 228 Pac. 135). Such discretion so vested by law in the prosecuting officer is both official and personal (Engle v. Chipman (Mich.), 16 N. W. 886). Such discretion exercised in good faith authorizes the prosecuting officer to personally determine, in conference and in collaboration with peace officers and liquor enforcement officers, that a certain plan of action or a certain policy of enforcement will be best productive of law enforcement, and will best result in general law observance. That there were such conferences, and repeated contacts and collaboration between respondent and such governmental agencies in the case at bar, is a circumstance shedding light upon whether the prosecuting attorney's action or non-action in a case or cases was an arbitrary exercise of discretion or a good faith exercise of discretion. . . .

"It appearing in the record that respondent did at all times and in each instance in good faith exercise his discretion, and it further not appearing anywhere in this record that respondent's discretion was at any time arbitrarily exercised, or that his discretion was corruptly exercised, or exercised in bad faith, the Special Commissioner concludes that in those cases wherein he exercised his discretion and did not prosecute, or entered a nolle prosequi, the respondent had the legal right to reach the conclusion he did reach with respect to prosecution or no prosecution. . . . And that respondent has not been guilty of any act, or conduct, or of any omission, meriting the forfeiture of his right to occupy the office of prosecuting attorney."

Relator relies on State ex inf. McKittrick v. Wymore, 345 Mo. 169, 132 S. W. (2d) 979; State ex inf. McKittrick v. Graves, 346 Mo. 990, 144 S. W. (2d) 91; and State ex inf. McKittrick v. Williams, 346 Mo. 1003, 144 S. W. (2d) 98, to sustain his claim that respondent willfully and unlawfully failed to properly enforce the liquor control laws. However, the facts in those cases are far different from the situation in this case. In the Wymore case, there was a complete failure of the prosecuting attorney to ever commence any prosecution for violation of gambling laws, even after having full information about conditions. This court found that "he made no effort whatsoever to perform his duties as prosecuting attorney"; and that he "never even reached the point where he pretended to exercise discretion", but instead was "under the influence of evil men". Obviously that is not the situation here. Both the Graves and Williams cases involved continuous long existing conditions of flagrant, open and notorious gambling, prostitution and illegal sale of intoxicating liquor frequently pointed out by the press. The officers involved made no efforts to enforce these laws (and there were also many ad-

mitted violations of election laws in the Graves case) and claimed that they should be excused for not doing so because the Kansas City police did not attempt any enforcement. That likewise is clearly not the situation here. On the contrary, a careful consideration of the evidence heard by the Commissioner convinces us that his findings are fully supported by the evidence and that he was correct in reaching the conclusion and making the recommendation "that the information filed by the relator be dismissed."

The information is, therefore, dismissed. All concur.