

# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI, )
)
                    Respondent, )
)
v. )     No. SC94295
)
ANDREW LUKE LEMASTERS, )
)
                    Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF NEWTON COUNTY
The Honorable Timothy W. Perigo, Judge

*Opinion issued February 24, 2015*

Andrew Lemasters was convicted of one count of first-degree statutory sodomy. In this appeal, Lemasters argues that the trial court erred by: (1) denying his motion to disqualify the entire Newton County Prosecuting Attorney's Office ("NCPAO"); and (2) entering a written judgment recording convictions on two counts of first-degree statutory sodomy even though he was tried and convicted of only one count. The Court finds merit in the second point but not the first.

Lemasters' former public defender went to work at the NCPAO prior to Lemasters' trial and, therefore, was disqualified from participating in his prosecution. Her conflict, however, was not imputed to the remainder of the office under the Rules of Professional Conduct, and a reasonable person would have no factual basis to find an appearance of impropriety in this case and doubt the fairness of Lemasters' trial.

Accordingly, the Court affirms the judgment on one count of first-degree statutory sodomy but vacates the judgment as to the second count and remands this case to the trial court with instructions to correct the written judgment to reflect what actually occurred.

## *Background*

Lemasters' daughter ("HL") was born in 1992. In 2001, HL was living with Lemasters and his wife ("Wife"). Wife was not HL's mother, but she raised HL, and the two were very close. Lemasters does not challenge the sufficiency of the evidence in this appeal, and the facts of his crime are not relevant to his appellate claims. Suffice it to say, therefore, that Lemasters subjected HL to acts of statutory sodomy in the spring of 2001 and beyond. HL did not tell anyone of this abuse until much later, however, because she was afraid she would be separated from Wife and the rest of her family. When HL did report Lemasters' conduct, he was charged with two counts of first-degree statutory sodomy under section 566.062, RSMo 2000.

On August 7, 2012, the trial court appointed the Missouri State Public Defender System ("MSPD") to represent Lemasters on these charges. The following day, the MSPD sent Lemasters an introductory letter stating that an attorney would be assigned to defend him. On August 16, 2012, Ms. Cheney – an employee of the MSPD – entered her appearance on behalf of Lemasters.

After receiving telephone calls from members of Lemasters' family, Cheney instructed her secretary to return the calls and inform the family that Cheney could not speak with them about Lemasters' case without his permission. She also instructed her secretary to tell the family that Cheney could not help them obtain a power of attorney

from Lemasters because that was a civil matter unrelated to her representation of Lemasters in the criminal case. The language Cheney used in these instructions was derogatory toward Lemasters' family, and the tone of her instructions indicated Cheney's frustration with them.

Cheney had little direct contact with Lemasters. She had one interview with him in August 2012, which lasted approximately 15 minutes. After this visit, Cheney asked one of her investigators to conduct a recorded interview with Lemasters because his extensive use of pronouns made it difficult for Cheney to "keep track of what he's talking about." Cheney also moved for a reduction of Lemasters' bond. She appeared in court to argue that motion, and it was overruled.

In September 2012, Cheney was hired by the NCPAO. Her last day with the MSPD was September 7, 2012. That day, Cheney wrote an interoffice "transfer memorandum" to the public defenders who were preparing for the preliminary hearing in Lemasters' case. Again, the language of Cheney's memo indicated her frustration with the case, and her memo was derogatory regarding the likelihood that Lemasters could mount a successful defense.

Cheney started work in the NCPAO on September 10, 2012. On February 7, 2013, Lemasters moved to disqualify the entire prosecutor's office due to Cheney's prior representation of him. The trial court held a hearing on Lemasters' motion the following day. Cheney testified that she did not participate "in the prosecution of any individuals where [she] previously represented them" and that she did not discuss any of those cases with others in the prosecutor's office except to identify the defendants she previously

3

represented. The trial court overruled Lemasters' motion, and, in June 2013, the case was tried to a jury.

During the instruction conference, the trial judge noted that the "state has elected to dismiss one of the two counts." As a result, only one count of first-degree statutory sodomy was submitted to the jury. The jury found Lemasters guilty of only one count, and the trial court sentenced Lemasters to 31 years in prison for only one count. Nevertheless, the written judgment reflects that Lemasters was convicted of two counts of first-degree statutory sodomy. Lemasters appeals, and this Court has jurisdiction under article V, section 10, of the Missouri Constitution.

## I.      *Disqualifying the Newton County Prosecuting Attorney's Office*

Lemasters claims the trial court erred in overruling his motion to disqualify the entire NCPAO from participating in his case notwithstanding that Cheney did not participate or divulge to the other prosecutors any information she learned while representing Lemasters. Lemasters contends that he is entitled to a new trial because Cheney's conflict disqualified all of the other lawyers in the NCPAO, and that – even if her conflict is not imputed to the remainder of the prosecutor's office – Cheney's conflict created an appearance of impropriety that denied him a fair trial. The Court rejects this argument.

A trial court's ruling on a motion to disqualify is reviewed for abuse of discretion. *See State v. Smith*, 32 S.W.3d 532, 543 (Mo. banc 2000). "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a

4

lack of careful consideration." *State v. Taylor*, 134 S.W.3d 21, 26 (Mo. banc 2004). "If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion." *Id.* The facts of this case show no abuse of discretion.

### A. The Rules of Professional Conduct

There is no doubt that Cheney had a conflict that prohibited her from participating in the prosecution of Lemasters after she joined the NCPAO. She was a "public officer or employee" when she worked with MSPD; therefore, she was a "former" governmental attorney for purposes of Rule 4-1.11(a).[1] As a result, under Rule 4-1.11(a)(2), Cheney's defense of Lemasters while employed by the MSPD prohibited her from representing the state while employed in the NCPAO because it was the "same or a substantially related matter" and because the MSPD and Lemasters did not consent to Cheney's participation in the prosecution.

As a "former" governmental lawyer with MSPD, not only did Rule 4-1.11(a)(2) prohibit Cheney from participating in Lemasters' prosecution, Rule 4-1.11(a)(1) required

---

[1] Rule 4-1.11(a) provides:

> (a) Except as law may otherwise expressly permit, a lawyer who has formerly served as a public officer or employee of the government:
>
>> (1) is subject to Rule 4-1.9(c); and
>>
>> (2) shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation.

her to comply with Rule 4-1.9(c) in her new position. Rule 4-1.9(c),[2] in turn, prohibited Cheney (except in circumstances not pertinent here) from revealing any information relating to her representation of Lemasters or using such information to his disadvantage.

The evidence shows that Cheney complied with her obligations under Rules 4-1.11(a)(2) and 4-1.9(c). She did not participate in Lemasters' prosecution after joining the prosecutor's office, and she did not divulge any information gleaned from her prior representation of him. Though not conceding these points, Lemasters fails to point to any evidence that Cheney violated Rule 4-1.9(c) or Rule 4-1.11(a).

The heart of Lemasters' claim focuses not on Cheney's conduct but on the real or perceived impact of that conduct on the remainder of the NCPAO. LeMasters argues that Cheney's conflict must be imputed to the entire prosecutor's office so that none of the other prosecutors could prosecute his case. Even if her conflict is not imputed, Lemasters argues that the failure to disqualify the entire NCPAO created an appearance of impropriety and deprived him of his right to a fair trial. Lemasters' claim is not based on the Rules of Professional Conduct. Instead, he argues that it stems from his constitutional right to a fair trial and this Court's decision in *State v. Ross*, 829 S.W.2d 948, 949 (Mo. banc 1992).

---

[2] Rule 4-1.9(c) provides:

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

6

Lemasters may not rely on the Rules of Professional Conduct, but the Court's analysis of his claim must begin with those rules. Rule 4-1.9(a) is the general rule regarding conflicts arising from prior representations, but that rule does not apply to prior representations by current or former "public officers or employees." Instead, those conflicts are addressed in Rule 4-1.11(a), which deals with conflicts arising from prior representations by *former* public officers or employees, and Rule 4-1.11(d), which deals with conflicts arising from prior representations by *current* public officers or employees. Both provisions must be consulted in this case because Cheney was both a former employee of MSPD and a current employee of NCPAO.

By the same token, even though Rule 4-1.10[3] is the general rule regarding when a lawyer's conflicts will be imputed to other lawyers, it only imputes conflicts among "lawyers [who] are associated in a firm." Rule 4-1.10 does not address when to impute the conflict of a current or former "public officer or employee of the government" to other lawyers. Again, Rule 4-1.11 controls that question.

As discussed above, because Cheney was a former "public officer or employee" with the MSPD, Rule 4-1.11(a) governs whether and to what extent her representation of Lemasters created a conflict for her when she joined the NCPAO. And, under Rule 4-1.11(b), Cheney clearly had a conflict that prohibited her from participating in Lemasters'

---

[3] Rule 4-1.10(a) provides:

> (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 4-1.7 or 4-1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

7

prosecution because she had participated personally and substantially in the same matter while employed at the MSPD. Because Cheney had a conflict under Rule 4-1.11(a) that prevented her from participating in Lemasters prosecution as an employee in the NCPAO, Rule 4-1.11(b) governs the effect of that conflict on the other lawyers in that office. Under Rule 4-1.11(b),[4] however, a former governmental attorney's conflict under Rule 4-1.11(a) is only imputed to "lawyer[s] in a firm in which that lawyer [is now] associated." Throughout Rule 4-1.11, the word "firm" does not include (and, in fact, it is used in juxtaposition to) lawyers working together as "public officers or employees of the government." Accordingly, Cheney's conflict as a former governmental attorney under Rule 4-1.11(a) is not imputed to the remainder of the NCPAO because a prosecutor's office is not a "firm" as that word is used in Rule 4-1.11(b).

Next, the Court must consider Rule 4-1.11(d). This rule applies because, even though Cheney was a former governmental attorney due to her employment at the MSPD, she also was a current "public officer or employee" due to her employment at the

---

[4] Rule 4-1.11(b) provides:

> (b) When a lawyer is disqualified from representation under Rule 4-1.11(a), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter unless:
>
> > (1) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
> >
> > (2) written notice is promptly given to the appropriate government agency to enable it to ascertain compliance with the provisions of this Rule 4-1.11.

8

NCPAO. Under Rule 4-1.11(d),[5] however, a current governmental attorney is prohibited only from representing the government in a matter in which the lawyer "participated personally and substantially *while in private practice or nongovernmental employment*[.]" [Emphasis added.] Cheney was an employee of the MSPD when she represented Lemasters; she was not in "private practice or nongovernmental employment." Accordingly, Cheney had no conflict under Rule 4-1.11(d) despite her prior representation of Lemasters.

And even if Cheney had a conflict under Rule 4-1.11(d), nothing in Rule 4-1.11 would impute that conflict to other "public officers or employees" in the NCPAO. The Comments to Rule 4-1.11(d) explain this result and the reasons for it:

> Because of the special problems raised by imputation within a government agency, *Rule 4-1.11(d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees*, although ordinarily it will be prudent to screen such lawyers.

Rule 4-1.11(d) (Comment 2) (emphasis added).

Accordingly, there is no basis in the Rules of Professional Conduct to disqualify the entire NCPAO based on Cheney's representation of Lemasters when she was with the MSPD. The only conflict created by that representation was under Rule 4-1.11(a), which

---

[5] Rule 4-1.11(d) provides:

> (d) Except as law may otherwise expressly permit, a lawyer currently serving as a public officer or employee:
>
> > (1) is subject to Rules 4-1.7 and 4-1.9; and
> > (2) shall not: (i) participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment, unless the appropriate government agency gives its informed consent, confirmed in writing ….

9

prohibited Cheney from participating in Lemasters' prosecution, and nothing in Rule 4-1.11 (or elsewhere) imputes that conflict to the remainder of the NCPAO.

### B. *Appearance of Impropriety*

The Court's conclusion that the Rules of Professional Conduct do not impute Cheney's conflict under Rule 4-1.11(a) to the other attorneys in the NCPAO such that they, too, must be disqualified from participating in Lemasters' prosecution does not end the analysis. The trial court likely would have sustained Lemasters' motion if Cheney's conflict was so imputed, but the converse is not necessarily true. Lemasters sought disqualification of the entire NCPAO based on his constitutional right to a fair trial, not as a means of enforcing the Rules of Professional Conduct. As a result, he argues that even if office-wide disqualification is not required by those rules, it nevertheless is necessary if the failure to disqualify the entire prosecutor's office creates an appearance of impropriety and casts doubt on the fairness of the trial. The Court agrees with this principle, but not its application in Lemasters' case.

Society's confidence in the judicial system – and, in particular, the criminal justice system – depends on society's perception that the system is fair and its results are worthy of reliance. For that reason, it is essential that trials be fair. *See In re Murchison,* 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). But that alone is not sufficient. Instead, "justice must satisfy the ***appearance*** of justice." *Offutt v. United States,* 348 U.S. 11, 14 (1954) (emphasis added). A procedure that appears to be unfair can jeopardize society's confidence in the judicial

10

system as a whole even if the procedure is – in fact – fair. Accordingly, this Court must pursue fairness both in the law's substance and in its appearance.

That said, an appearance of impropriety judged only from the defendant's perspective cannot be sufficient for relief. Instead, the touchstone for claims that present a real threat to the apparent fairness of the system is what knowledge of all the facts and circumstances would suggest to a reasonable person. When reviewing similar claims concerning judicial disqualification, therefore, this Court has held that the trial judge must disqualify herself when "a reasonable person would have factual grounds to find an appearance of impropriety and doubt the impartiality of the court." *Anderson v. State*, 402 S.W.3d 86, 91 (Mo. banc 2013). The same standard applies here. *Ross*, 829 S.W.2d at 949. Accordingly, even if an assistant prosecutor's conflict is not imputed to the remainder of the office under the Rules of Professional Conduct, the remainder of the prosecutor's office must be disqualified if a reasonable person with knowledge of the facts would find an appearance of impropriety and doubt the fairness of the trial.[6]

Lemasters argues that, because this Court disqualified the entire prosecutor's office in *Ross*, the entire NCPAO should have been disqualified in his case. This is incorrect, and the differences between the two cases are instructive. In *Ross*, a part-time assistant prosecutor brought criminal assault charges against Ross even though another

---

[6] The state argues that the phrase "appearance of impropriety" was the standard used in the former rules of professional conduct that stated lawyers should strive to avoid "the appearance of impropriety." Rule 4, EC 9–6, Missouri Court Rules (1983) (repealed 1986). As a result of the change in 1986 deleting this standard, the state contends the appearance of impropriety is not relevant to the resolution of Lemasters' claim. This is not so, however, as indicated by the fact that both *Ross* and *State ex rel. Burns v. Richards*, 248 S.W.3d 603 (Mo. banc 2008), continued to employ an appearance of impropriety analysis to resolve similar claims.

11

lawyer in the assistant prosecutor's law firm (who also was a part-time prosecutor) was already representing Ross in a civil action arising out of the same assault. *Id*. at 949-50. The problem in *Ross* was **concurrent** representations – not **successive** ones.[7] As a result, Rule 4-1.11 did not control.[8] Instead, the applicable rules were Rules 4-1.7 ("a lawyer shall not represent a client if the representation involves a concurrent conflict of interest") and 4-1.10 ("none of [the lawyers in a private firm] shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so"). *Ross*, 829 S.W.2d at 950-51.

Under Rule 4-1.7, because Ross did not expressly waive the conflict, the private attorney defending him on civil claims arising out of an assault could not – at the same time – represent the state for purposes of bringing criminal charges against him for the same conduct. *Id*. And, because Rule 4-1.7 did not permit one lawyer to represent both sides of that case, Rule 4-1.10 prohibited two lawyers in the same firm from doing so. Accordingly, neither of the part-time prosecutors could participate in Ross' prosecution. *Id.*

In *Ross*, however, just as in the present case, the Court identified no basis in the Rules of Professional Conduct to impute the individual assistant prosecutors' conflict to the remainder of the prosecutor's office so as to preclude them from participating in

---

[7] In *State v. Reinschmidt*, 984 S.W.2d 189 (Mo. App. 1998), the court failed to recognize the importance of this distinction from *Ross*. *Id.* at 192. Accordingly, *Reinschmidt* and its interpretation of *Ross* should no longer be followed.

[8] Even though Rule 4-1.11 was referenced in *Ross* due to both attorneys' status as part-time prosecutors, the Court decided that they had conflicts under Rule 4-1.7 (which were imputed to each other under Rule 4-1.10) because they remained private attorneys in a "firm" and, therefore, were subject to those rules' more stringent restrictions. *Ross*, 829 S.W.2d at 950-51.

Ross' prosecution. Instead, the Court focused on whether the failure to disqualify the entire prosecutor's office created an appearance of impropriety. *Ross*, 829 S.W.2d at 951. But, unlike the present case, the Court noted in *Ross* that **there were facts** that – if known to a reasonable person – would create an appearance of impropriety and cast doubt on the fairness of the trial. "[T]he interconnections between the prosecuting attorney's office and the law firm handling [Ross'] related civil case create … suspicions and appearances of impropriety and show that members of the prosecuting attorney's office had the potential access" to confidential information from Ross' civil case that the prosecution could use against him in the criminal case. *Id*. Ross also claimed that he was "chilled" from testifying in his own defense as a result of not knowing what his lawyer may have divulged to the prosecutor. As Judge Rendlen pointed out in his concurrence, it was not this claim that merited relief but the evidence in support of it. "[T]he record must demonstrate there existed circumstances which merit the perceived 'chill'. Allegations must be based upon the record for merit to be given to a defendant's claim." *Ross*, 829 S.W.2d at 953-54 (Rendlen, J., concurring).

Equally important, the Court in *Ross* noted that **there were no facts** that – if known to a reasonable person – would have dispelled the appearance of impropriety and restored confidence in the fairness of the trial. Instead, the Court stated: "There is equally **no evidence** of steps taken to insulate the actual prosecutor from the conflict. The State construes certain unsworn, timely-objected-to statements by the prosecutor as evidence that insulation occurred de facto." *Id.* at 952 (emphasis added). Accordingly, in *Ross*, not only were there facts that – if known to a reasonable person – would create an

13

appearance of impropriety and cast doubt on the fairness of the process, but there also were no countervailing facts to dispel that appearance and restore confidence in the fairness of the trial.

Lemasters' case is just the reverse. First, there are no facts that – if known to a reasonable person – would create an appearance of impropriety and cast doubt on the fairness of his trial. Second, the evidence showed – and the trial court found – facts that precluded any appearance of impropriety that otherwise might have cast doubt on the fairness of Lemasters' trial. The evidence was undisputed that the NCPAO followed the prudent course and screened Cheney completely from Lemasters' prosecution. Cheney did not participate in – or assist with – the state's case against Lemasters in any way. Not only did she not divulge any of Lemasters' confidential information to the prosecutors working on his case, but Lemasters also knew nearly five months before his trial that Cheney had been screened from his case. As a result, even if he initially feared that such disclosures might have occurred (as Ross did), Lemasters' fears could not have affected his defense at trial (as Ross' fears did) because Lemasters knew months before his case went to trial that Cheney had kept his confidences.

Lemasters makes much of the disclosure that – while working at MSPD – Cheney made derogatory comments about his family and disparaging comments about his prospects for a successful defense. But the evidence also shows that the other attorneys in the NCPAO did not know about Cheney's statements (or, at least, that they did not know of them until Lemasters elicited evidence about them at the hearing on his motion to disqualify). These statements reflect poorly on Cheney's professionalism while

14

working at the MSPD, but they have no bearing on whether the trial court should have disqualified the remainder of the attorneys in the NCPAO who did not make those statements and comments, did not know about them, and were not working with Cheney when she made them. Unlike in *Ross*, therefore, no reasonable person with knowledge of the facts in this case would believe they create an appearance of impropriety or cast doubt on the fairness of Lemasters' trial. And, unlike in *Ross*, even if the Court assumes such an appearance and doubt, the evidence showing that the NCPAO and Cheney took adequate and effective measures to prevent any communication between Cheney and the other prosecutors dispels that appearance and removes that doubt.

The reasonable person standard applicable to Lemasters' motion should not be confused with a requirement that actual prejudice be shown. *See State v. Smulls*, 935 S.W.2d 9, 26 (Mo. banc 1996) (the "standard by which we determine the question [of judicial disqualification] is not whether the trial judge is actually prejudiced … [but] whether there is an objective basis upon which a reasonable person could base a doubt about the racial impartiality of the trial court"). This is because there may be cases in which proof of a thorough and effective screening process (like that used by the NCPAO in this case) will not be sufficient to prevent a reasonable person from concluding, based upon all the facts and circumstances, that an appearance of impropriety casts doubt on the fairness of a trial.

For example, in *State ex rel. Burns v. Richards*, 248 S.W.3d 603, 605 (Mo. banc 2008), the Court held that a newly elected prosecutor could not bring criminal charges against an individual who, prior to the election, the prosecutor had defended on very

15

recent and very similar charges. In such cases, a reasonable person may well conclude that the facts create an appearance of impropriety and cast doubt on the fairness of the trial, even though there is no actual prejudice, i.e., even though the prosecutor did not – in fact – divulge any confidential communication to, or otherwise assist in, the prosecution. Even a thorough and successful screening process may not be sufficient to remove the appearance of impropriety and dispel the resulting doubt when it is the prosecutor herself, i.e., "the boss," who supposedly is being screened from the remainder of her employees, rather than one assistant being screened from the others.

Accordingly, the Court holds that the trial court did not abuse its discretion in overruling Lemasters' motion to disqualify the entire NCPAO. A reasonable person with knowledge of all the facts and circumstances in this case need not conclude that they create an appearance of impropriety that casts doubt on the fairness of Lemasters' trial.

## II.     *Error in the Written Judgment*

In his second point, Lemasters argues the trial court erred by entering a written judgment that reflects convictions of two counts of first-degree statutory sodomy when, in fact, Lemasters was convicted of only one count of that offense. The State concedes this was error, and the Court agrees.

Clerical errors in the sentence and judgment in a criminal case may be corrected by an order *nunc pro tunc* if the written judgment does not reflect what actually was done. *Soehlke v. Soehlke*, 398 S.W.3d 10, 22 (Mo. banc 2013) ("the only true function of a nunc pro tunc order is to correct some error or inadvertence in the recording of that which was *actually done,* but which, because of that error or omission was not properly

16

recorded") (quotation marks omitted).  In a criminal case, Rule 29.12(c) allows the court to "amend its records according to the truth, so that they should accurately express the history of the proceedings which actually occurred prior to the appeal."  *McGuire v. Kenoma, LLC*, 447 S.W.3d 659, 663 (Mo. banc 2014) (quotation marks omitted) (considering the use of Rule 74.06(a) in civil cases).

The written judgment in this case does not reflect what occurred during Lemasters' trial and sentencing.  Even though Lemasters initially was charged with two counts of first-degree statutory sodomy, the trial court stated during the instruction conference that the State had dismissed one of the counts.  Only one verdict director was submitted to the jury, and the jury returned only one guilty verdict.  At sentencing, the trial court specifically imposed a single 31-year sentence on the single conviction.  The written judgment, however, erroneously records these events by stating that Lemasters was found guilty on two counts of first-degree statutory sodomy.  Accordingly, this is a proper circumstance – indeed, the prototypical circumstance – for an order *nunc pro tunc* correcting the written judgment to reflect what actually occurred.  *See State v. Primm*, 347 S.W.3d 66, 73 (Mo. banc 2011) ("cause is remanded to the trial court for the entry of a *nunc pro tunc* order correcting the written judgment").

17

## *Conclusion*

For the reasons set forth above, the judgment as to one count of first-degree statutory sodomy is affirmed. The judgment as to the second count of first-degree statutory sodomy is vacated. The case is remanded with directions that the trial court vacate its judgment with respect to the second count of statutory sodomy.

_____
Paul C. Wilson, Judge

All concur.